**DODSON LIVESTOCK COMPANY,**
Plaintiff,

v.

**UNITED STATES, Defendant.**

No. 95–771C.

United States Court of Federal Claims.

Dec. 23, 1998.

Michael P. Guta, San Francisco, California, attorney of record for the plaintiff.

Shalom Brilliant, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were David M. Cohen, Director, Civil Division, and Frank W. Hunger, Assistant Attorney General, attorneys of record for the defendant. Michael F. Kiely, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

The above-captioned case comes before the court on the defendant's motion for partial dismissal pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC) for lack of subject matter jurisdiction. Specifically, the defendant has moved to dismiss the claim regarding seventeen of the eighteen sheep that are at issue in this case. The plaintiff, Dodson Livestock Company (Dodson Livestock), filed a complaint for breach of contract in this court alleging that the United States, acting through the United States Department of Agriculture, Meat and Animal Research Center (MARC), breached representations that eighteen sheep Dodson Livestock purchased at a MARC auction would be "sound, healthy, guaranteed breeders." Dodson Livestock claims that at some time prior to the sale, despite these alleged warranties, the sheep became infected with paratuberculosis. Plaintiff argues that this incurable disease, once introduced into its existing flock, forced Dodson Livestock to sell its entire Texel flock for slaughter, along with its entire cashmere goat herd, which was also exposed to the disease. Dodson Livestock concludes that this breach frustrated the company's ability to become the leading Texel sheep breeder in the United States, and caused damages of $57,628,202.00 in lost profits.

According to the government, the initial claim that was submitted to the contracting officer concerned only one of the eighteen sheep that Dodson Livestock purchased. The government maintains that this court does not have subject matter jurisdiction to entertain "so much of plaintiff's complaint as may be construed to assert a cause of action other than for breach of warranty in the sale of the one ram [identified as # 806173]." Moreover, while Dodson Livestock states that the claim arises from the sale of Texel sheep which were infected with paratuberculosis, defendant contends that the plaintiff fails to show that any sheep other than the one mentioned in the claim were infected with paratuberculosis. Thus, according to the government, pursuant to 28 U.S.C. § 1491(a)(2) (1994) and 41 U.S.C. § 605(a) (1994), the plaintiff is precluded from including damages related to the seventeen sheep, or to any additional sheep that were not specifically mentioned in the claim to the contracting officer, because the contracting officer had no occasion to rule on claims related to any sheep other than sheep # 806173, which was specifically alleged to be diseased in the original claim.

The government further argues that it is impossible to bring the suit for the breach of one contract that included all eighteen sheep because each item purchased at an auction constitutes a separate contract of sale, regardless of whether the items were included on one bill of sale and paid for with one check, as in this case. Finally, the government maintains that Dodson Livestock's breach of contract claim in this court is substantially different than the claim that was submitted to the contracting officer. The government argues that the genesis of plaintiff's claim to the contracting officer was a breach of implied and express warranties, whereas now the plaintiff also has added a claim based on a theory of breach of an

alleged duty on the part of the government to disclose the test results indicating that the sheep may have had paratuberculosis.

The plaintiff responds that the initial claim to the contracting officer related to all eighteen sheep, and that, therefore, this court has subject matter jurisdiction over the entire claim. Dodson Livestock contends that the language of the claim submitted to the contracting officer clearly indicates that the complaint refers to all of the sheep that the company purchased. Plaintiff further argues that the statement in the contracting officer's final decision that this claim arose "out of a sales contract for Texel sheep" shows that the contracting officer also understood the claim for damages to relate to all eighteen sheep and the herd, rather than just the one sheep that was specifically mentioned in the claim.

### FACTS

The plaintiff, Dodson Livestock Company (Dodson Livestock), is a Missouri corporation specializing in the production of sheep and goats. Prior to August, 1992, Dodson had a thriving cashmere goat business and had gained a reputation as a breeder of quality purebred sheep and goats. In the early part of 1992, plaintiff began to formulate plans to become a leader in the breeding of Texel sheep. Dodson Livestock intended to develop a purebred Texel flock for sale to other breeders of both purebred and commercial flocks.

As a result of federal import restrictions, the only source of Texel sheep in the United States in 1992 was the United States Meat Animal Research Center (MARC) in Clay Center, Nebraska. On July 8, 1992, the MARC published a flyer advertising the U.S. MARC Annual Surplus Breeding Sheep Sale auction to be held on August 14, 1992. The flyer stated: "[e]nclosed is performance or pedigree information for sale rams and Texel ewes. Full performance information will be

available on all the sale ewes the day of the sale. All animals sold will be sound, healthy, guaranteed breeders."

Potential buyers, including Mr. Dennis Dodson, the President of Dodson Livestock, were provided with a sales catalog when they registered for the auction. Copies of the catalog also were distributed on site for the buyers' convenience. The catalog contained detailed information for the individual sheep, such as identification number, date of birth, weight, and fertility rate. It also included a "REMARKS" section setting out general sheep purchasing details, such as acceptable forms of payment, arrangement of subsequent transportation, and the health condition of the sheep at the time of auction. The following paragraph was found under the heading "Condition and Health" in the "REMARKS" section of the catalog:

All mature animals were recently treated for internal and external parasites, foot trimmed, and foot bathed. The MARC flocks harbor some level of Paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections. Based on the availability of reliable tests, or observations, efforts have been made to screen sale animals against these and other maladies.

In addition, an auction supervisor read the "General" and "Condition and Health" sections of the catalog verbatim to the buyers prior to beginning the sale. Then, after announcing which sheep had been removed due to illness, the supervisor began the auction.[1]

The parties have stipulated that Dennis Dodson received the catalog the night before the auction, but that he did not read the REMARKS section.[2] At the auction, Dodson Livestock purchased eighteen purebred Texel sheep, including fifteen ewes and three rams. Dodson Livestock paid $83,650.00 for the sheep, including $15,500.00 for one ram identified as # 806173.

1. Prior to the auction, the sheep were tested for paratuberculosis and other common maladies by an independent laboratory. While the buyers were notified which sheep were withdrawn due to illness, they were not apprised of the quantitative test results.

2. It is not clear from the record whether Dennis Dodson heard the auction supervisor read the REMARKS section aloud. However, the supervisor, Mr. Michael H. Wallace, recalls Mr. Dodson being present.

Approximately a year later, in September of 1993, ram # 806173 began to display symptoms of an overall weakened condition that included weight loss, lack of appetite, and diarrhea. A preliminary examination, conducted at the Department of Clinical Sciences, Veterinary Medical Teaching Hospital at Kansas State University, indicated that the ram suffered from paratuberculosis. This disease has no cure, is generally fatal in infected animals, and is seldom treated with any success. According to plaintiff, once an infected animal is discovered within a flock, the recommended course of treatment is to destroy or sell for slaughter the entire flock. The treating veterinarian recommended that the ram be euthanized. A subsequent autopsy revealed that the initial diagnosis of paratuberculosis was correct.

Dodson Livestock then consulted with leading sheep veterinarians and nationally recognized experts concerning the effect that the contaminated ram may have had on other sheep with which it came into contact. Due to the high risk of contamination, all of the experts recommended that plaintiff sell its exposed flocks for slaughter. Since the infected ram had come into contact with the other Texel sheep and the cashmere goats, Dodson Livestock sold for slaughter both herds in their entirety.

On August 16, 1994, Dodson Livestock filed a certified claim with a government contracting officer. The introduction to the claim said that it "concern[ed] damages sustained by Dodson Livestock because of breach of representations concerning Texel sheep purchased by Dodson Livestock at [the auction]." After outlining the plaintiff's allegations regarding the factual circumstances behind the sheep purchase, the claim read as follows:

All available evidence indicates that the infected ram had paratuberculosis when it was sold to Dodson Livestock in 1992 by U.S. MARC. This is due to the fact that this disease is contracted by animals when they are young (primarily in their first year of life) and the disease's long period of incubation. The information provided to Dodson Livestock at the August 14, 1992 sale indicated that the ram had a birthdate

of April 4, 1988, making it four years old as of the date of sale. Scientific evidence indicates that it is unlikely for a ram of this age to contract paratuberculosis, as opposed to becoming a carrier. Additionally, information provided at the auction sale indicated that all Texel sheep sold at the sale had been quarantined at the U.S. MARC facility prior to the sale. Accordingly, the only conclusion is that the ram was infected with paratuberculosis upon its sale to Dodson Livestock.

The sale information distributed prior to the auction and at the auction indicated that all sheep sold would be sound, healthy, guaranteed breeders. Within the sheep industry, such a statement means that all subject sheep would be free from any diseases that affect their marketability as breeders.... As a result of the indicated ram being infected with paratuberculosis, Dodson Livestock had to sell its entire flock of Texel sheep and cashmere goats. Dodson Livestock no longer has the ability to become the leading producer of Texel breeding sheep within the United States because of this occurrence. The conduct of U.S. MARC in selling the ram infected with paratuberculosis constitutes a breach of its representation that the animal would be a sound, healthy and guaranteed breeder. In addition, this constitutes a breach of the implied warranty of merchantability in that it is expected that such an animal would pass within the industry without paratuberculosis. This conduct by U.S. MARC creates a breach of the Sales Contract and has resulted in substantial damages to Dodson Livestock.

The claim also included a damages calculation based on work done by Dr. Patrick McMurry, a Professor of Economics at Missouri Western State College in St. Joseph, Missouri. According to the plaintiff, "[t]he damages calculated are lost profits from sales of sheep and goats anticipated for 1993–98 and discounted to present value," and "conservatively" are estimated at $57,-628,202.00.

In a letter dated November 29, 1994, the Department of Agriculture responded to Dodson Livestock and issued a final rejection

of its claim. The letter read in pertinent part as follows:

> This letter is in response to the Claim of Dodson Livestock Co., dated August 16, 1994.... in the amount of $57,628,202 arising out of a sales contract for Texel sheep on August 14, 1992.
>
> For the reasons expressed below, this claim is denied in its entirety: first, MARC did not breach any representation concerning Texel sheep purchased by Dodson Livestock at the August 14, 1992, auction because the sale catalog expressly stated that "The MARC flocks harbor some level of Paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections."; second, MARC did not breach any implied warranty of merchantability, if such existed, because MARC had effectively disclaimed any such implied warranty of merchantability by making the above-mentioned disclaimer in the sale catalogue.

Dodson Livestock subsequently filed its complaint in this court. Thereafter, it became apparent that the parties disagreed as to whether Dodson had stated a claim with respect to the entire flock of Texel sheep purchased at the auction, or only as to the one infected ram. In a joint status report filed on April 10, 1997, plaintiff also argued that, "if the Court finds no warranty was breached it must then determine whether defendant failed to disclose and or [sic] otherwise is liable for contractual fraud regarding [the pre-auction disease testing of the sheep]." Another status conference, held on April 16, 1997, failed to resolve the disagreement concerning the proper scope of the claims as filed in this court.

Therefore, on May 30, 1998, the government filed a motion to dismiss "so much of plaintiff's complaint as may be construed to assert a cause of action other than for breach of warranty in the sale of the one ram [identified as #806173]." The government argues that this court does not have jurisdiction to hear claims either beyond the single ram or relating to MARC's alleged failure to inform Dodson Livestock of any test results prior to the auction, because such claims were not submitted to the contracting officer as required by the Contract Disputes Act.

## DISCUSSION

The defendant has filed a motion to dismiss pursuant to RCFC 12(b)(1) for lack of subject matter jurisdiction. When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1), and/or a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 746; *Alaska v. United States,* 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States,* 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). The court should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80

(1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

In order for this court to have jurisdiction over plaintiff's complaint, the Tucker Act, as amended, 28 U.S.C.A. § 1491 (West 1994 & Supp.1998), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *United States v. Testan*, 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan*, 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fair-

ly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States*, 17 Cl.Ct. 475, 479 (1989), *aff'd*, 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (citing *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport S. S. Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States*, 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied*, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

■ It is undisputed that claims brought under the CDA must first be submitted in writing to the contracting officer for a final decision. 41 U.S.C. § 605(a); *see Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d 856, 858 (Fed.Cir.1987); *Paragon Energy Corp. v. United States*, 227 Ct.Cl. 176, 645 F.2d 966, 971 (Ct.Cl.1981). The CDA does not require that the complaint be submitted on any particular type of form or that a complaint use any particular wording. *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed.Cir.1987). "All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Id.* For claims greater than $100,000.00, as in the instant case, the contractor must certify that "the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable, and that the certifier is duly authorized to certify the claim on behalf of the contractor." 41 U.S.C. § 605(c). On appeal to either a contract board of appeals or to this court, the plaintiff may increase the amount of the claim, but may not raise any claims that were not presented and certified (if over $100,000) to the contracting officer. *Santa Fe Engineers, Inc. v. United States*, 818 F.2d at 858.

■ On August 16, 1994, Dodson Livestock submitted a certified claim to the contracting officer seeking $57,628,202.00. The

parties dispute whether the claim presented to the contracting officer covered all eighteen Texel sheep purchased by Dodson Livestock at the MARC auction, or just ram # 806173. If the claim to the contracting officer related only to ram # 806173, then, absent an opportunity for the contracting officer to consider claims relating to the other seventeen sheep, the court may not entertain such claims. *See Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d at 858.

In support of its argument that the claim before the contracting officer encompassed all eighteen sheep, plaintiff points to language from the claim which speaks in general terms of Texel sheep. Plaintiff begins by noting that the first page of the claim states that "[t]his claim concerns damages sustained by Dodson Livestock because of breach of representations concerning Texel sheep purchased by Dodson Livestock at this sale [the MARC auction]." However, the quoted statement is made in a brief paragraph titled "I: Introduction," and the paragraph speaks only in generalities. This part of plaintiff's claim provides no information on how many Texel sheep were offered for sale or how many, in fact, were purchased by the plaintiff. In addition, the quoted language does not specify the exact number of sheep on which the government "breached representations." The court cannot automatically assume that this language covers all eighteen sheep merely because of the general reference to sheep in the plural.

In contrast to this generality and lack of specificity in the introductory paragraph, there is particularity in the words used to present the specifics of plaintiff's claim to the contracting officer. In the next portion of plaintiff's claim describing the history of the case, titled "II: U.S. MARC's Breach of Sales Contract," there is specific and extended discussion of ram # 806173, but of no other ram or ewe by number. Moreover, when Dodson Livestock presented its theory

of recovery later in this same section II of the claim to the contracting officer, reference is made to one ram. It reads:

> As a result of *the indicated ram* being infected with paratuberculosis, Dodson Livestock had to sell its entire flock of Texel sheep and cashmere goats.... The conduct of U.S. MARC in selling the ram infected with paratuberculosis constitutes a breach of its representation that *the animal* would be a sound, healthy and guaranteed breeder. In addition, this constitutes a breach of the implied warranty of merchantability in that it is expected that such *an animal* would pass within the industry without paratuberculosis.

(emphasis added). The court notes that this is the only non-introductory portion of plaintiff's claim which specifically alleges a theory of recovery, breach of contract. As the emphasis above shows, Dodson Livestock, when stating their claim, twice referred only to a single ram. Any plural references to Texel sheep made elsewhere in the claim are insufficient to overcome the explicit denotation of breach of warranty with respect only to ram # 806173.

Furthermore, plaintiff's language also serves to counter its assertion that the claim language could be inferred to cover all eighteen sheep due to the incorporation by reference of the single bill of sale which Dennis Dodson took away from the auction. In plaintiff's claim to the contracting officer, immediately following the language which is quoted above and which begins with "[t]he conduct of U.S. MARC in selling *the ram* ..." (emphasis added), plaintiff goes on to state that "[t]his conduct by U.S. MARC creates a breach of the Sales Contract and has resulted in substantial damages to Dodson Livestock." Thus, the conduct on which plaintiff seeks to base its breach of the sales contract was the sale by U.S. MARC of one ram only, ram # 806173.[3]

---

**3.** The government also draws the court's attention to a section of American Jurisprudence, citing 7 Am.Jur.2d § 16 (1980 & Supp.1991). Defendant contends that this section supports the proposition that each purchase of an individual sheep at the auction should be considered as a separate contract. The current edition of American Jurisprudence addresses this issue as follows:

**§ 38. Entire or separate contracts**
   In applying the statute of frauds to auction sales, courts determine whether several purchases made by one bidder constitute so many separate and distinct contracts, or are to be

In the contracting officer's final decision, there is insufficient language to conclusively support Dodson Livestock's contention that the plaintiff raised, and the contracting officer considered, a breach of contract claim with respect to all eighteen Texel sheep. On November 25, 1994, the contracting officer denied, in its entirety, Dodson Livestock's claim, which the contracting officer's decision characterized as "arising out of a sales contract for Texel sheep on August 14, 1992." The final decision also stated:

first, MARC did not breach any representation concerning Texel *sheep* purchased by Dodson Livestock at the August 14, 1992, auction because the sale catalogue expressly stated that "The MARC flocks harbor some level of paratuberculosis (Johne's) and Ovine Progressive Pneumonia (OPP) infections."; second, MARC did not breach any implied warranty of merchantability, if such existed, because MARC had effectively disclaimed any such implied warranty of merchantability by making the above-mentioned disclaimer in the sale catalogue.

(emphasis added).

Plaintiff asks the court to read these references to Texel sheep in the plural as indicative of the contracting officer's intent to address all eighteen sheep. The court declines to do so in light of the references to the single ram in Dodson Livestock's claim presented to the contracting officer. Similar to the generalized language included by the plaintiff in its claim, it is also significant that the contracting officer never refers specifically to "eighteen" sheep or "all" of the sheep. Rather, the court believes that the contracting officer used the term "sheep" in the

quotation included immediately above only to address the fact that there was no warranty with regards to any of the sheep put up for sale at the August 14, 1992, MARC auction; the contracting officer was not addressing the specifics of plaintiff's claim. There is insufficient language in either plaintiff's claim or in the contracting officer's final decision to counteract the language in the claim that the alleged breach of warranty and resulting damages related to only one single ram. The submission of claims to the contracting officer before availing oneself of board or court remedies should not be implied, but must be performed with sufficient specificity to permit the full and intelligent consideration of the claim by the contracting officer.

■■■ The second issue which the court must address in this motion to dismiss is whether Dodson Livestock has met its burden of establishing jurisdiction regarding its claim that the government breached an alleged duty to disclose pre-auction test results. As stated above, in an action in this court, a contractor may increase the amount of its claim, but may not raise new claims or theories of recovery not presented to the contracting officer for a final decision. *See Santa Fe Eng'rs, Inc. v. United States*, 818 F.2d at 858. In *Santa Fe Eng'rs, Inc. v. United States*, the United States Court of Appeals for the Federal Circuit held that claims not properly presented and certified to the contracting officer were not properly before a Board of Contract Appeals, and that the plaintiff was precluded from changing the scope of its argument after the contracting officer had made a final decision with regards

considered as one single contract. The answer to this question depends on the circumstances of each individual case, the manner in which the transactions between the parties were concluded, and their understanding and intentions in the matter, rather than on the fact that the various items were sold at auction and were struck off to the same party at the same sale. This principle applies equally whether the subject matter of the sale is realty or personality, though of course the nature of the property sold may have a bearing on the intention of the parties.

7 Am.Jur.2d *Auctions and Auctioneers* § 38 (1997) (footnote omitted).

While the court is required to decide any disputed facts which are relevant to the issue of jurisdiction, *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 747, the issue of whether there was a single sales contract or eighteen individual contracts does not affect the court's decision here. Even if there was a single contract, the claim language as construed by the court would indicate a claim by Dodson Livestock only for partial breach of that contract, in particular a breach of warranty with respect to ram # 806173.

thereto and without an opportunity to review such matters. *See id.* at 858–59.

In the instant case, plaintiff's claim to the contracting officer alleged a breach of alleged express warranties and a breach of the implied warranty of merchantability. Specifically, Dodson proposed that:

The conduct of U.S. MARC in selling the ram infected with paratuberculosis constitutes a breach of its representation that the animal would be a sound, healthy and guaranteed breeder. In addition, this constitutes a breach of the implied warranty of merchantability in that it is expected that such an animal would pass within the industry without paratuberculosis.

Subsequent to both submitting its claim to the contracting officer and filing its complaint with this court, Dodson Livestock indicated in a joint status report, filed April 10, 1997, that, "if the Court finds no warranty was breached it must then determine whether defendant failed to disclose and or otherwise is liable for contractual fraud regarding the [pre-auction] test results and the failure of defendant to [perform further tests] on those sheep testing 'suspect'."

Dodson Livestock first raised this argument more than one year after the complaint to this court was filed. It was never addressed in the claim to the contracting officer, in the original complaint to the court, or in plaintiff's response to the government's motion to dismiss. As a result of its absence from Dodson Livestock's claim letter to the contracting officer on August 16, 1994, the court finds that plaintiff's new theory of recovery regarding the breach of duty to disclose cannot be considered by this court prior to consideration by the contracting officer.

### CONCLUSION

After thoroughly reviewing the record and carefully considering the arguments, the court holds that the claim presented to the contracting officer raised only claims relative to the Texel ram identified as # 806173. Therefore, the court **GRANTS** the defendant's motion to dismiss, without prejudice, so much of plaintiff's complaint as plaintiff alleges should be construed to assert a cause of action other than for breach of warranty in the sale of that particular ram. The court also finds that the claim of governmental breach of duty to disclose the pre-auction test results was never presented to the contracting officer. Thus, the court also **GRANTS** the defendant's motion to dismiss any causes of action raised by the plaintiff with respect to that issue, also without prejudice. Any claims regarding the seventeen sheep other than ram # 806173, or regarding an alleged breach of a duty to disclose the pre-auction test results, must first be presented to the contracting officer for consideration prior to being included in a claim before this court.

**IT IS SO ORDERED.**